|  |  |
|---|---|
| **WEITING LYU,**<br><br>**Plaintiff,**<br><br>-against-<br><br>**ALFA CHEMISTRY INC.,**<br>**CD BIOSCIENCES, INC.,**<br>**CREATIVE BIOGENE INC.,**<br>**DONGHAI CHEN, and NANNAN LIN,**<br><br>**Defendants.** | **Case No. 23 Civ. 7951**<br><br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Weiting Lyu ("Plaintiff" or "Ms. Lyu"), by and through her attorneys Kessler Matura P.C. and Aaron Halegua, PLLC, complaining of Alfa Chemistry Inc. ("Alfa"), CD BioSciences, Inc. ("CD"), Creative Biogene Inc. ("Creative") (together Alfa, CD, and Creative are referred to as the "Corporate Defendants"), Donghai Chen ("Chen"), and Nannan Lin a/k/a Nina Lin ("Lin"), alleges as follows:

## INTRODUCTION

1.      Plaintiff is Chinese female who arrived in the United States in 2017 and obtained her PhD in medicinal chemistry from Rutgers University in October 2022. One month after graduation, Plaintiff began her first job in the United States, which was working for Defendants, who promised her $130,000 to work 40 hours per week and to sponsor her H-1B visa application.

2.      During Plaintiff's employment from November 18, 2022 to May 15, 2023, Defendants engaged in illegal and fraudulent practices which included forcing Plaintiff to perform tasks that violated numerous federal and state laws and/or that blatantly defrauded Defendants' customers, including U.S. federal government agencies and public universities.  For instance,

Defendants sold chemicals and products that it claimed were made in the United States but were actually sourced from China.

3.     Defendants' other business performed analyses of biological samples.  Defendants told customers that they analyzed the samples in their laboratories in the United States; however, they were actually sent to China for analysis.  In furthering these fraudulent businesses, Defendants required Plaintiff to remove the labels of biological samples of things like human blood or tissue (which cannot legally be shipped to China) and replace them with fraudulent labels misstating the contents (for instance, as plasmid from bacteria).  Defendants also required Plaintiff to help prepare Certificates of Analysis ("COAs") stating that samples were analyzed by Defendants in the United States when they were actually analyzed by various labs in China.  Defendants even affixed the signature of a nonexistent and fictious individual (Adolf Jones) to the COAs.

4.     Indeed, roughly eight years earlier, as reported in *Newsday*, the Federal Aviation Administration had proposed fines against Defendants for shipping undeclared hazardous material that was prohibited on cargo flights and lacked the required labels, packaging, and shipping papers. The hazardous materials also caused inspectors to experience coughing fits and extreme eye, nose, and throat irritation.

5.     Moreover, as part of carrying out their illegal and fraudulent operation, Defendants engaged in a variety of illegal employment practices to maintain an obedient, underpaid workforce of female immigrant employees, including Plaintiff, who were unlikely to complain about or report Defendants' unlawful practices.

6.     Defendants discriminated against Plaintiff because of her race and national origin in violation of 42 U.S.C. § 1981 ("Section 1981") and the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq*. ("NYSHRL"); discriminated against Plaintiff because of her sex in

violation of the NYSHRL; failed to pay Plaintiff overtime in violation of the New York Labor Law ("NYLL"); terminated Plaintiff in retaliation for complaining about Defendant's illegal wage and hour, discrimination, and other practices in violation of Section 1981, the NYSHRL, and NYLL; and threatened Plaintiff with serious harm if she did not continue working for Defendants in violation of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1589, 1595 ("TVPRA").

## **NATURE OF THE CLAIMS**

7.     Defendants unlawful conduct described herein was committed in violation of Section 1981, the NYSHRL, the NYLL, and the TVPRA.

## **JURISDICTION & VENUE**

8.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

9.     The Court has supplemental jurisdiction over Plaintiff's related claims arising under the NYSHRL and NYLL pursuant to 28 U.S.C. § 1367(a).

10.     This action lies properly in the Eastern District of New York, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims herein occurred in the Eastern District of New York.

## **THE PARTIES**

### *Plaintiff Weiting Lyu*

11.     Plaintiff Weiting Lyu is a Chinese woman.

12.     Ms. Lyu was employed by Creative Biogene, Inc. as a Senior Research Scientist from November 18, 2022 until February 8, 2023, and was then transferred to its sister company Alfa where she worked as a Project Manager from February 9, 2023 until May 15, 2023.

13.     Ms. Lyu is a "person" entitled to "make and enforce contracts" pursuant to 42 U.S.C. § 1981(a)-(b).

14.     At all times relevant, Ms. Lyu was an "employee" within the meaning of the NYSHRL.

15.     At all times relevant, Ms. Lyu was an "employee" within the meaning of the NYLL.

### Defendant Alfa Chemistry Inc.

16.     Defendant Alfa is "a leading supplier of chemicals, Alfa Chemistry is continuously improving its processes to remain at the forefront of current and upcoming regulations." *See* https://www.alfa-chemistry.com/about-us/quality-regulatory.html (last accessed, Sept. 23, 2023).

17.     Upon information and belief, Alfa was and still is a corporation organized and existing pursuant to the laws of the State of New York.

18.     Upon information and belief, at all times hereinafter mentioned, Alfa was and still is a "non-governmental" entity per Section 1981(c).

19.     At all times relevant, Alfa was and still is an "employer" within the meaning of the NYSHRL.

20.     At all times relevant, Alfa was and still is an "employer" within the meaning of the NYLL.

21.     Alfa maintains control, oversight, and direction over its operations and employment practices.

22.     Alfa's principal place of business was and still is 2200 Smithtown Avenue, Ronkonkoma, New York.

## Defendant Creative Biogene Inc.

23. Upon information and belief, Creative was and still is still a corporation organized and existing pursuant to the laws of the State of New York.

24. Upon information and belief, at all times hereinafter mentioned, Creative was and still is a "non-governmental" entity per Section 1981(c).

25. At all times relevant, Creative was and still is an "employer" within the meaning of the NYLL.

26. At all times relevant, Creative was and still is an "employer" within the meaning of the NYSHRL.

27. Creative maintains control, oversight, and direction over its operations and employment practices.

28. Creative's principal place of business was and still is 17 Ramsey Road, Shirley, New York.

## Defendant CD BioSciences, Inc.

29. Defendant CD "is a trusted research product supplier and CRO based in New York. With high-quality reagents and comprehensive services, CD BioSciences is the one-stop shop devoted to researchers making advancements in signaling pathway studies." https://www.cd-biosciences.com/about-us.html (last accessed, Oct. 4, 2023).

30. Defendant CD is the parent company of Defendants Alpha and Creative, and several other companies.

31. Upon information and belief, CD is a corporation organized and existing pursuant to the laws of the State of New York.

32.     Upon information and belief, CD was and still is authorized to do business in the State of New York.

33.     Upon information and belief, at all times hereinafter mentioned, CD was and still is a "non-governmental" entity per Section 1981(c).

34.     At all times relevant, CD was and still is an "employer" within the meaning of the NYSHRL.

35.     At all times relevant, CD was and still is an "employer" within the meaning of the NYLL.

36.     Upon information and belief, CD maintains control, oversight, and direction over its operations and employment practices.

37.     Upon information and belief, CD's principal place of business was and still is 17 Ramsey Road, Shirley, New York.

### *Defendant Donghai Chen*

38.     Upon information and belief, Defendant Chen is a resident of the State of New York, County of Suffolk.

39.     Defendant Chen is the founder and owner of each of the Corporate Defendants.

40.     Defendant Chen is Chief Executive Officer of Defendant CD.

41.     Defendant Chen set the policies and procedures for each of the Corporate Defendants.

42.     Defendant Chen has the authority to hire and fire employees for Corporate Defendants, and he both hired and ultimately fired Plaintiff.

43.     Defendant Chen has the authority over payroll decisions for Corporate Defendants and is the one who set Plaintiff's salary.

44.     Upon information and belief, Defendant Chen has the power to make binding decisions for Corporate Defendants.

45.     Upon information and belief, Defendant Chen has the power to transfer the assets or liabilities of Corporate Defendants.

46.     Upon information and belief, Defendant Chen has the power to declare bankruptcy on behalf of Corporate Defendants.

47.     Upon information and belief, Defendant Chen has the power to enter into contracts on behalf of Corporate Defendants.

48.     Defendant Chen hired Plaintiff to work for the Corporate Defendants, determined her conditions of employment, determined her rate of pay, and had ultimate authority over the decision to fire her.

49.     At all times hereinafter mentioned, Defendant Donghai Chen was and still is an "employer" within the meaning of all applicable statutes.

### *Defendant Nannan Lin*

50.     Upon information and belief, Defendant Nannan Lin is a resident of the State of New York, County of Suffolk.

51.     Upon information and belief, Lin began working for the Chen and the Corporate Defendants in or around 2020.

52.     Upon information and belief, during the times relevant to this complaint, Lin was a high-ranking officer of the Corporate Defendants.

53.     Upon information and belief, during the times relevant to this compliant, Lin also served as a manager and had numerous employees under her direction and control, including Plaintiff and the male workers who harassed and bullied Plaintiff.

54.     Defendant Lin was involved in hiring Plaintiff and signed Plaintiff's employment agreement with Alfa.

55.     Defendant Lin directed Plaintiff's work schedule and other terms and conditions of her employment.

56.     Defendant Lin played a significant role in the decision to fire Plaintiff.

## **FACTUAL ALLEGATIONS**

### *Plaintiff's Employment*

57.     Plaintiff is a racially and ethnically Chinese woman.

58.     Plaintiff was born and raised in the People's Republic of China.

59.     Plaintiff obtained her PhD in medicinal chemistry from Rutgers University in October 2022.

60.     In or around August 2022, Defendant Chen offered Plaintiff a job with Creative as Senior Research Scientist at a salary of $130,000 and a promise to sponsor her for an H-1B visa.

61.     Plaintiff executed an employment agreement with Creative when she began working there. A copy of the agreement is attached as **Exhibit A** ("Creative Employment Agreement").

62.     Defendants also had a set of "U.S. H-1B Work Visa Application and Processing Procedures" that provided that an employee must work for Defendants for four years if Defendants sponsor the employee for an H-1B visa and it is approved. If the employee does not work for the full four years, the employee must not only repay the costs of the visa application, but also must pay liquidated damages of up to $48,000.

63.     Plaintiff's first day of work at Creative was on or about November 18, 2022.

64. After Plaintiff worked for more than two months, Defendants stated that Creative would no longer sponsor her H-1B visa and that she would need to transfer to one of Creative's sister companies, Alfa.

65. Plaintiff started as a Project Manager at Alfa on or around February 2023.

66. Plaintiff executed an employment agreement with Alfa when she began working there, which was virtually identical to the one she signed with Creative. A copy of the agreement with Alfa is attached as **Exhibit B** ("Alfa Employment Agreement").

67. During her employment, Plaintiff performed very little scientific work.

68. Instead, Plaintiff's work primarily consisted of the routine task of communicating with customers and with employees in China about fulfilling orders.

69. Plaintiff's work for Defendants did not require the exercise of any discretion or professional judgment.

70. Plaintiff's last day of work for Defendants was on or about May 15, 2023.

### *Defendants Alfa, Creative, and CD Constitute a Joint Employer*

71. The Corporate Defendants should be considered as joint employers, alter egos, a single employer, or an integrated or common enterprise for all times relevant to this complaint.

72. The Corporate Defendants have common ownership and management.

73. Defendant Chen is the owner of the Corporate Defendants.

74. The Corporate Defendants have interrelated operations.

75. Upon information and belief, the Corporate Defendants commingle funds.

76. Defendant Chen established and operated a WeChat group that includes employees from all of the Corporate Defendants.

77.     On the first Friday of every month, Chinese employees from each of the Corporate Defendants are required to attend a meeting held via the WeChat group.

78.     The Corporate Defendants all share a single financial department, which processes the salaries for employees at all of the companies.

79.     The Corporate Defendants maintained control, oversight, and direction over shared employment practices, including the terms of Plaintiff's employment.

80.     For example, Defendant Lin performs recruitment and conducts employee interviews for all of the Corporate Defendants.

81.     The confidentiality agreement that Plaintiff was required to sign applied to Creative and any of its "partner companies" with whom it does business or "related companies," in which Creative's founding partner (Defendant Chen) owns over 20%.

82.     The employment agreements that Plaintiff signed with Creative and Alfa were virtually identical except for the logo at the top.

83.     The Corporate Defendants share employees who often perform tasks for entities other than the one that technically hired them.

84.     Plaintiff and her co-workers, while ostensibly employed by one corporate Defendant, were required to perform tasks for the other Corporate Defendants. For instance, Plaintiff was required to send and receive packages on behalf of multiple entities as well as answer telephone calls on behalf of multiple entities.

85.     Upon information and belief, at all times hereinafter mentioned, Defendants individually and collectively were Plaintiff's "employer" within the meaning of all relevant statutes.

### *Defendants' Fraudulent Conduct*

86.     During her employment, Plaintiff learned of Defendants' unlawful and fraudulent conduct.

87.     One of Defendants' businesses involves selling chemicals to U.S. customers.

88.     Plaintiff learned that Defendants would advertise products as being made in the United States, but then import them from China and falsely label them as produced by Defendants in the United States.

89.     The imported products were analyzed in China, sometimes in factories not even owned by Defendants, but Defendants then produced fraudulent certificates stating that the products were analyzed in their own laborites in the United States. The certificates were signed by "Adolf Jones, Manager Quality Control"— an entirely fictitious person.

90.     On information and belief, the U.S. military is one of Defendants' customers who purchased chemicals under the belief that they were produced and tested in the United States.

91.     Defendant Alfa's website also proclaims that its customers include pharmaceutical and biotechnology companies, including Pfizer, Amgen, GSK, Roche, BASF, Dow 3M and DuPont, (*see* https://www.alfa-chemistry.com/products/main-products-867.html, last accessed, Oct. 25, 2023) as well as many universities and non-profit institutions.

92.     Defendants also provided a service of analyzing biological samples for customers, which Defendants said was performed in the United States. Defendants received biological samples (e.g., human blood and/or tissue) and claimed to analyze the samples in their Long Island laboratory.  However, Defendants did not analyze the samples there. In fact, Defendants did not even have the proper, working machinery to analyze the samples in its United States' offices. Instead, the samples were sent to laboratories in China for analysis.

93.     Defendants instructed Plaintiff and other Chinese employees to scrape the accurate labels off the human biological samples (e.g., human tissue) and relabel them as something else (e.g., plasmid) that was not subject to the same strict U.S. government shipping and labeling restrictions.

94.     Defendants also performed analyses of medicines sent to them by customers. While Defendants advertised that these analyses were conducted in its labs in the United States, Defendants' machine did not even have the capability to perform these analyses. Instead, the medicines were sent to China to be analyzed.

95.     Defendants made a concerted effort to avoid detection of their illegal and fraudulent practices. For instance, Defendants established multiple entities and used multiple shipping addresses to detract attention from any one company. Some of these addresses were empty buildings without any employees or equipment.

96.     Defendants instructed Plaintiff and other employees not to tell customers or others outside the company the address of the company's offices or the true businesses and activities that Defendants are involved in.

97.     In or around February/March 2023, at a company meeting, Plaintiff complained that Defendants' practice of selling medicine without requisite certification or quality control assessment was unethical and illegal.

98.     In response to Plaintiff's complaint, her coworkers instructed her to "not ask or you'll be fired."

99.     Defendant Lin told Plaintiff that she should "not bother" with these concerns about the legality of Defendants' operations "as long as the company makes money."

100.     In or around February/March 2023, at a company social event, Plaintiff complained about Defendants' business of illegally smuggling rare earth materials from China to the United States. Defendant Lin was extremely angered by her complaint.

### *Race and National Origin Discrimination*

101.     Defendants treat Chinese employees less well than white American employees.

102.     On information and belief, Defendants employed around 50 employees, but only around 10% were not Chinese.

103.     Defendants created a WeChat group that was comprised of only Chinese employees to send communications that they did not want the white American employees to see.

104.     In January 2023, Plaintiff was presented with an official employment offer letter from Alfa, that promised five paid personal days in her first year of employment—the standard company policy that the white American employees enjoyed.

105.     However, during her onboarding training, Plaintiff, like other Chinese employees, was provided a written notice, only in Chinese, announcing that she actually was not entitled to any paid time off in her first year of employment.

106.     The notice was sent via Defendants' Chinese-only WeChat group.

107.     Upon hiring, Plaintiff, like all other Chinese employees, was required to provide Defendants with information about their family members, including the occupation and address of their spouse and parents.

108.     Non-Chinese employees were not required to submit such information about their family members.

109.     Upon hiring, like all other Chinese employees, Plaintiff was required to sign a highly restrictive confidentiality agreement intended to intimidate them.

110.    The confidentiality agreement provided to Plaintiff and the other Chinese employees, but not the non-Chinese employees, contains extreme terms, including that it is "effective forever," it is "globally enforceable," and that it may be enforced through the courts of "any country."

111.    Defendants required Plaintiff and other Chinese employees to participate in illegal activities designed to defraud customers and evade U.S. legal regulations; but non-Chinese employees were not asked to engage in those activities.

*Sex Discrimination*

112.     Ms. Lyu and her female coworkers were subjected to a hostile work environment and worse terms and conditions of employment than Defendants' male employees.

113.    Defendant Chen openly admitted on multiple occasions Defendants' preference for hiring women because they do not complain.

114.    Defendants also told Plaintiff that Defendants that they only recruited Chinese females because they are less "wild" than males and are better at "serving" clients and supervisors.

115.    Plaintiff was informed several times by Defendant Chen that they "don't want to hire males since they'll more likely seek revenge."

116.    Nearly all of Defendants' employees were female.

117.    After being hired, Plaintiff and other female employees were subjected to bullying and harassment by Defendants, including company executives as well as their male coworkers.

118.    Defendant Chen and other executives, including Defendant Lin, knew about, permitted, and encouraged the discriminatory treatment of Plaintiff and other female employees.

119.    On or about March 20, 2023, when Ms. Lyu asked a male coworker about a certain client, he screamed at Ms. Lyu and threw a credit card in her face.

120.    On or about March 27, 2023, another male coworker verbally attacked Ms. Lyu while the two, who held positions at the same level, were on a business trip. The male coworker pointed at Ms. Lyu's face and scolded her that her "work is meaningless," she was "wasting our time and money," and she was only there to assist his work.

121.    A. male colleague told Plaintiff that if a female employee was not good at sales, she should stay home and look after her husband and children.

122.    Ms. Lyu reported the discrimination and bullying to her manager, Defendant Lin Nannan.

123.    Instead of putting an end to the harassment and discipling the harassers, Defendant Lin pointed at Ms. Lyu's face and told her to "shut up!" Lin then demanded that Ms. Lyu apologize to the male coworkers who harassed her.

124.    Defendants had a pattern of hostile treatment towards female employees.

125.    R.G., another female employee in the same department, was harassed by a male coworker both in person and in a company WeChat group. For instance, the male coworker said to R.G. in the company WeChat group: "Do you think you're a fucking princess?" ("你他妈以为自己是公主还是啥呀?"); "If your brain is sick go to a neurologist. Can you stop being an annoying fucking idiot everyday?" ("脑子有病你就去看脑科，别天天像个傻逼二百五一样烦人好不好?"); "Do you know how much you have tortured us in these past days?" ("你知不知道你这几天把大家折磨成什么样子了?").

126.    Ms. Lin was part of this WeChat group and witnessed the harassment of R.G.

127.    Defendants never expressed any disapproval of such harassing behavior and treatment, let alone took any measures to discipline the harasser.

128.    Instead, Defendants fostered an environment in which discriminating, humiliating, and harassing female employees was entirely permissible.

129.    As a result, R.G. suffered from serious depression and had to leave the company.

*Wage and Hour Violations -- Overtime*

130.    Plaintiff and Defendants had an agreement that she would work a "7+1" schedule, which means that she would work 7 hours in the office and 1 hour from home each day.

131.    However, Defendants consistently made Plaintiff work for more than 8 hours a day in person and then participate in evening meetings that often lasted more than one hour.

132.    Defendants frequently mandated that Plaintiff work extra hours on the weekends-–including by participating in a weekly meeting on Friday evening (Saturday morning in China) that was usually scheduled for 5:30-9:00 p.m. and a weekly meeting on Sunday night meeting (Monday morning in China) that often started 1–3 hours late.

133.    During her employment, Defendants also required Plaintiff to come into the office on weekends on numerous occasions to perform various tasks.

134.    Defendants organized training sessions outside of normal work hours and encouraged employees to attend, but did not pay any extra wages for attending.

135.    Defendants required that Plaintiff always be available to receive (and promptly respond to) calls or emails from her customers located throughout the United States, Europe, Africa, and elsewhere.

136.    Defendants required Plaintiff to carry a work phone 24 hours per day, 7 days per week.

137.    Defendant Alfa's website (https://www.alfa-chemistry.com/index) advertises: "24/7 On-Time Technical Support."

138. Defendants would make test calls to the phones of Plaintiff and her coworkers in order to ensure that she was carrying and answering her phone at all times. If an employee did not answer, then Defendants would punish that worker.

139. Ms. Lyu regularly worked about 55 hours per week.

140. Defendants never paid Plaintiff any additional compensation for the extra hours (above 40 in a week) that she worked for Defendants.

### *Wage and Hour Violations – Wage Notice and Wage Statement*

141. Defendants failed to provide Ms. Lyu with a wage notice within 10 days of the start of her employment either with Creative or Alfa as required by law.

142. Defendants did not provide Ms. Lyu with a wage statement each pay period that accurately reported her hours worked and the basis for her pay as required by law.

143. Defendants' failure to provide Plaintiff with a wage notice, accurate wage statements, or otherwise comply with wage and hour laws facilitated Defendants' policy and practice of not providing her and other Chinese workers with overtime pay.

### *Forced Labor*

144. Defendants coerced Plaintiff to continue working for them by threatening that she would suffer serious harm if she stopped.

145. Defendants purposefully employed Chinese females, like Plaintiff, who it knew were unlikely to complain about their mistreatment and exploitation.

146. Defendants purposefully employed Chinese immigrants who were dependent on Defendant for their right to remain in the United States.

147. Plaintiff was dependent on Defendants' sponsoring her work visa for her to remain in the United States, and would likely be forced to return to China if Defendants refused to sponsor her or terminated their sponsorship of her visa.

148. Defendants knew that if Plaintiff returned to China, she would be unable to earn the same salary that she was earning in the United States, even despite Defendants' wage and hour violations, such as the failure to pay overtime.

149. Defendants forced Plaintiff to sign an employment agreement that obligated her to work for Defendants for two years and to pay Defendants liquidated damages up to $24,000 if she did not.

150. Defendants deducted $4260 from Plaintiff's pay for expenses related to her H-1B application, as shown in her employment contracts with Alfa and Creative.

151. Defendants' H-1B visa policy stated that if the company sponsored an employee, and the employee received the H-1B visa, then the employee must work for the company for four years and would pay liquidated damages up to $48,000 if the employee left early.

152. Plaintiff believed that the imposition of either the $24,000 or $48,000 liquidated damages penalty would cause her serious harm.

153. Neither the $24,000 nor $48,000 liquidated damages penalty approximates the actual damages that Defendants would suffer if Plaintiff left her job before the contract term expired.

154. Plaintiff was compelled to participate in Defendants' illegal and fraudulent conduct. This created a risk that government authorities could prosecute her and/or deport her for participating in these crimes. Accordingly, Plaintiff was therefore afraid to complain to authorities about Defendants' mistreatment and exploitation of her and her colleagues.

155.    Defendants compelled Plaintiff to provide detailed information about her parents back in China—including their geographical location, employer, and specific job title. This was a means of intimidating Plaintiff by demonstrating that the company could take action to harm her family members back in China.

156.    Plaintiff was aware of the fact that Defendants had an office in China and close government connections there, and that Defendant Chen regularly traveled back to China.

157.    Defendants' connections in China made Plaintiff fearful that they could exact revenge against Plaintiff's family members.

158.    Defendants generally engaged in demeaning and dehumanizing behavior towards Plaintiff to make her feel disempowered and less than human. This conduct includes defrauding her about working conditions, discriminating against her, harassing and bullying her, and scolding her when she raised complaints. This treatment furthered Plaintiff's sense that she had no choice but to endure the terrible treatment imposed on her by Defendants.

159.    Defendants had a pattern and practice of retaliating against employees who complain, which contributed to Plaintiff's sense of helplessness.

160.    When one employee complained about the fact that Chinese employees were not given PTO, Defendants extended her probation period from 3 to 6 months, required her to report regularly to senior management, and required her to engage in "emotional studies."

### *Retaliation and Termination*

161.    Defendants, through Chen and Lin, exhibited a pattern of consistently punishing Plaintiff whenever she complained of Defendants' unlawful conduct or asserted her own rights, and eventually terminated her in retaliation for her complaints.

162. During her employment, Plaintiff complained to Defendants about being forced to work at the office over the weekend without any extra pay.

163. Plaintiff complained to Defendant Lin about the hostility she was subjected to as a female employee; however, Defendant Lin told Plaintiff to "shut up." Defendant Lin then retaliated against Plaintiff by instructing that *she* (Plaintiff) should be the one to apologize to her coworkers.

164. Plaintiff was initially assigned by Defendants to do experimental research work. However, she insisted on wearing the appropriate personal protective equipment (PPE), such as a lab coat, gloves, and goggles. Plaintiff complained to Defendants that her coworkers did not wear the PPE. Plaintiff retaliated against her for complaining by not permitting her to do any other experiments, and Plaintiff then only did desk work.

165. At a company social event, Plaintiff complained to Defendants about their illegal practice of smuggling rare earth minerals into the United States from China. Defendant Lin did not welcome or accept the complaint, but rather grew angry towards Plaintiff.

166. On or about May 8, 2023, shortly after Plaintiff complained about being forced to work overtime and attend a meeting on Sunday night, Defendants retaliated against Plaintiff by stating that she could not continue in her current position. Instead, Defendants stated that she had three options: (1) go to another department and take a one-third pay cut, (2) leave the company altogether, or (3) apologize to her co-workers in the off chance they would let her stay with the company.

167. Plaintiff was shocked and emotionally distraught that Defendants, once again, rather than recognize her as the victim of abuse were instead treating her as the wrongdoer.

168. On or about May15, 2023, Defendants then terminated Plaintiff.

169.    In explaining the reasons for the termination, Defendant Lin admitted that Plaintiff was being fired because of her complaints. Defendant Lin cited complaints by Plaintiff's coworkers that she was "too much trouble," Plaintiff's insistence on wearing PPE and the fact that she did "not fit in," and Plaintiff's protests about Defendants' practices.

170.    In terminating her, Defendant Lin also mentioned that Plaintiff complained about being asked to work over the weekend and for leaving early when she was called in to work on a recent weekend day.

171.    Defendant Chen was aware of Plaintiff's termination and the reasons for that termination.

172.    In a conversation with Plaintiff around the time of her termination, Defendant Chen also noted the complaints made by Plaintiff and that she was too much of a scientist but not committed to the "business" of the company.

*Impact of Retaliation and Termination*

173.    After Plaintiff was terminated, the application that was submitted for an H-1B visa on Plaintiff's behalf was cancelled.

174.    If Defendants waited until the application was granted before terminating her and notifying USCIS, Plaintiff could have transferred the visa to another H-1B employer.

175.    Because Defendants terminated the application before it was granted, Plaintiff could only rely on her Optional Practical Training (OPT) period to work in the United States, but her OPT would expire one year after her graduation date.

176.    At the time Plaintiff was terminated, she had prepared to put down a deposit for a home on Long Island the following week.

177. Defendants' treatment of Plaintiff caused her to suffer severe emotional distress.

178. As a direct and proximate result of the emotional harm caused by Defendants, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to a award of damages.

**FIRST CAUSE OF ACTION**
**Race and National Origin Discrimination**
**Section 1981 Violation**
***(All Defendants)***

179. Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

180. Defendants intentionally discriminated against Plaintiff based on her Chinese race and national origin in violation of Section 1981.

181. Defendants subjected Plaintiff less favorable terms and conditions of employment than her white American employees, such as by denying her the same time off, imposing an onerous confidentiality agreement, imposing an onerous liquidated damages clause, and requesting sensitive information about her family members.

182. Defendants knew or should have known of these discriminatory acts against Plaintiff and failed to remedy it.

183. As a consequence of their conduct described above, Defendants Chen and Lin are personally and individually liable under Section 1981.

184. As a result of Defendants' unlawful discrimination, Plaintiff has suffered, and will continue to suffer, economic damages and emotional distress for which she is entitled to monetary damages.

185.     Plaintiff is entitled to an award of punitive damages because Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's statutory rights.

**SECOND CAUSE OF ACTION**
**Race and National Origin Discrimination**
**NYSHRL Violation**
***(All Defendants)***

186.     Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

187.     Defendants discriminated against Plaintiff on the basis of her race and national origin in violation of the NYSHRL by subjecting Plaintiff to less favorable terms and conditions of employment than her white American co-workers, including by subjecting her to bullying and harassment and then firing her when she complained about it..

188.     Defendants Chen and Lin are personally and individually liable under the NYSHRL as an aider and abettor of unlawful discrimination.

189.     As a result of Defendants' unlawful discrimination, Plaintiff has suffered, and will continue to suffer, economic damages and emotional distress for which she is entitled to monetary damages, punitive damages, attorney's fees, and other relief.

**THIRD CAUSE OF ACTION**
**Sex Discrimination**
**NYSHRL Violation**
**(*All Defendants*)**

190.     Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

191.     Defendants discriminated against Plaintiff on the basis of her sex in violation of the NYSHRL by subjecting Plaintiff to less favorable terms and conditions of employment than her male co-workers, including by subjecting her to bullying and harassment and then firing her when she complained about it.

192. Defendants discriminated against Plaintiff on the basis of her sex in violation of the NYSHRL by subjecting her to a hostile work environment, such as through subjecting her to verbal abuse by male coworkers, verbal abuse from Defendant Lin, and refusing to take any action to stop such treatment.

193. Defendants Chen and Lin are personally and individually liable under the NYSHRL as an aider and abettor of unlawful discrimination.

194. As a result of Defendants' unlawful discrimination in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic harm and emotional distress for which she is entitled to an award of monetary damages, punitive damages, attorney's fees, and other relief.

## FOURTH CAUSE OF ACTION
### Unpaid Overtime
### NYLL Violation
### (*All Defendants*)

195. Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

196. At all times relevant, Plaintiff was an employe and Defendants were her employer within the meaning of the NYLL.

197. Defendants failed to pay Plaintiff at a rate of one and one-half time her regular rate of pay for all hours worked.

198. By the course of conduct set forth above, Defendants violated the NYLL.

199. Defendants' failure to pay all overtime compensation due to Plaintiff was willful or otherwise lacked sufficient good faith within the meaning of the NYLL.

200. Plaintiff seeks the recovery of the underpayment of wages as well as liquidated damages, attorneys' fees, and costs to be paid by Defendants as provided by the NYLL, and such other legal and equitable relief as the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Failure to Provide Wage Notice
### NYLL Violation
### (*All Defendants*)

201.     Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

202.     Defendants failed to supply Plaintiff  notice as required by N.Y. Lab. Law § 195, in English or in the language identified by Plaintiff as her primary language, containing Plaintiff's rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the regular pay day designated by the employer in accordance with N.Y. Lab. Law § 191; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a  mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary.

203.     Due to Defendants' violations of N.Y. Lab. Law § 195, for each workweek that Defendants failed to provide a proper wage notice at the time of hiring, Plaintiff is entitled to damages of $50 per workday, or a total of $5,000 as provided for by N.Y. Lab. Law § 198, reasonable attorneys' fees, costs, and injunctive and declaratory relief.

## SIXTH CAUSE OF ACTION
### Failure to Provide Accurate Wage Statements
### NYLL Violation
### (*All Defendants*)

204.     Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

205.     Defendants failed to supply Plaintiff with an accurate statement of wages as required by N.Y. Lab. Law § 195, containing the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay

and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the number of hours worked, including overtime hours worked if applicable; deductions; and net wages.

206. Due to Defendants' violations of N.Y. Lab. Law § 195, for each workweek that Defendant failed to provide a proper wage statement, Plaintiff is entitled to damages of $250 per workday, or a total of $5,000, as provided for by N.Y. Lab. Law § 198, reasonable attorneys' fees, costs, and injunctive and declaratory relief.

## SEVENTH CAUSE OF ACTION
### Retaliation: Wrongful Termination
### Section 1981 Violation
### (*All Defendants*)

207. Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

208. Plaintiff opposed Defendants' discriminatory conduct.

209. Defendants violated Section 1981 by retaliating against Plaintiff for exercising her protected right.

210. As a result, Plaintiff is entitled to damages as set forth in Section 1981.

## EIGHTH CAUSE OF ACTION
### Retaliation: Wrongful Termination
### NYSHRL Violation
### (*All Defendants*)

211. Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

212. Plaintiff opposed Defendants' discriminatory conduct.

213. Defendants violated the NYSHRL by retaliating against Plaintiff for exercising her protected right.

214. As a result, Plaintiff is entitled to damages as set forth in the NYSHRL.

## NINTH CAUSE OF ACTION
### Retaliation: Wrongful Termination
### NYLL Violation
### (*All Defendants*)

215.    Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

216.    Defendants violated NYLL § 215(2) by retaliating against Plaintiff for exercising her protected right.

217.    Plaintiff's acts of inquiring and complaining about not receiving compensation for all hours worked qualifies as a protected activity under the NYLL.

218.    Plaintiff's termination was an adverse employment action.

219.    As a result of Defendants action, Plaintiff is entitled to damages as set forth in NYLL §215(2), in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
### Whistleblower Retaliation
### NYLL Violation
### (*All Defendants*)

220.    Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

221.    At all relevant times, Plaintiff was an employee protected under NYLL § 740 whistleblower protection provision.

222.    Plaintiff protested to coworkers and management about Defendants' illegal activities, policies, and procedures.

223.    Plaintiff reasonably believed that Defendants' activities, policies, and procedures constituted a violation of law, rule or regulation.

224.    Plaintiff reasonably believed that her supervisors were aware of the activity, policy, or practice and would not correct such activity, policy, or practice.

225.    Plaintiff's termination constituted an adverse personnel action under the NYLL § 740 whistleblower protection provision.

226.    Defendants would not have terminated Plaintiff's employment but for her protected activity of protesting a violation of a law, rule, or regulation.

227.    As a direct result of Defendants' unlawful retaliation, Plaintiff has sustained damages.

228.    Plaintiff further seeks the recovery of liquidated damages, attorneys' fees, and costs to be paid by Defendants as provided by the NYLL.

<h3 style="text-align:center">ELEVENTH CAUSE OF ACTION</h3>

**Forced Labor**
**TVPRA Violation**
(*All Defendants*)

229.    Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

230.    Defendants engaged in a scheme, plan, or pattern of behavior intended to cause Plaintiff to believe that, if she did not continue performing labor services, she or her relatives would suffer serious harm.

231.    Defendants benefited from Plaintiff continuing to perform her job and earn the company revenue despite Plaintiff being asked to engage in illegal conduct, facing discrimination and harassment, and receiving an unfair wage.

232.    Defendants also knowingly benefited from participating in a venture which obtained Plaintiff's labor services by causing her to believe that she or her relatives would suffer serious harm if she stopped working for them.

233.    Pursuant to 18 U.S.C. § 1595, Plaintiff seeks to recover her economic damages, emotional distress damages, punitive damages, attorneys' fees and costs stemming from Defendants' illegal acts.

## JURY DEMAND

234.   Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

235.   Wherefore, Plaintiff demands that a judgment be entered in her favor and that the Court order and award Plaintiff the following relief against Defendants:

  a.   A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violates federal and New York law;

  b.   An award of damages against Defendants in an amount to be determined at trial, including but not limited to compensation for Plaintiff's emotional distress;

  c.   Unpaid overtime pay and liquidated damages permitted by law pursuant to the NYLL;

  d.   An award of punitive damages in an amount to be determined at trial;

  e.   Pre-judgment interest on all amounts due;

  f.   An award of Plaintiff's reasonable attorneys' fees and costs; and

  g.   Such other and further relief as the Court may deem just and proper.


Date:   Melville, New York
        October 25, 2023

Respectfully submitted,

/s/ Troy L. Kessler
   Troy L. Kessler

**KESSLER MATURA P.C.**
Troy L. Kessler
Jocelyn Small
534 Broadhollow Road, Suite 275
Melville, NY 11747
(631) 499-9100
tkessler@kesslermatura.com
jsmall@kesslermatura.com

**AARON HALEGUA, PLLC**
Aaron Halegua
524 Broadway, 11th Floor
New York, NY 10012
(646) 854-9061
ah@aaronhalegua.com

*Attorneys for Plaintiff*