UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

WEITING LYU,

                    Plaintiff,          **MEMORANDUM & ORDER**
                                        23-CV-7951 (EK)(ST)

          -against-


ALFA CHEMISTRY INC., CD BIOSCIENCES,
INC., CREATIVE BIOGENE, INC., DONGHAI
CHEN, and NANNAN LIN,

                    Defendants.

------------------------------------x
ERIC KOMITEE, United States District Judge:

          Plaintiff Weiting Lyu sues three entities (her former

employers and their parent company) and two individuals (the

parent company's founder and one of her former supervisors).

She alleges that while working for the defendants, she was

forced to participate in illegal business practices, subjected

to racial and sexual discrimination, and ultimately fired for

complaining about this treatment.  She brings federal claims for

race discrimination, retaliation, and forced labor.  She also

brings analogous state-law claims under the New York State Human

Rights Law, and assorted wage-and-hour, whistleblower, and

retaliation claims under the New York Labor Law.

          The defendants have moved to dismiss all claims

against the parent company.  They also move to dismiss Lyu's

federal claims, and her state-law claims for race and sex discrimination, in their entirety.  Finally, they move to dismiss Lyu's New York Labor Law claims, but only as against her supervisor.

For the reasons discussed below, the defendants' motion is granted in part and denied in part.  The federal retaliation claim is dismissed for failure to state a claim, as are the New York Labor Law claims for lack of supplemental jurisdiction.  All other claims will proceed.

## I.    Background

The following facts are drawn from the plaintiff's complaint and are assumed true for the purposes of this motion. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).[1]

### A.    Lyu Joins Creative Biogene

Lyu is a Chinese woman who arrived in the United States in 2017.  Compl. ¶ 1.  She has a doctorate in medicinal chemistry from Rutgers.  *Id.*  In November 2022, Donghai Chen offered Lyu a job as a research scientist at Creative Biogene ("Creative").  *Id.* ¶ 60.  Creative is a medical testing and supply company.  *Id.* ¶¶ 29-30.  Chen is the owner and founder of Creative, and is also the chief executive officer of Creative's parent company, CD BioSciences.  *Id.* ¶¶ 30, 39-40.

---

[1] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

The job came with a salary of $130,000 and a promise that Creative would sponsor Lyu for an H1-B visa. *Id.* ¶ 1. Lyu accepted the job and signed an employment agreement with Creative. *Id.* ¶ 61. Her supervisor at Creative was Nannan Lin, who was "involved" in hiring her and "directed [her] work schedule." *Id.* ¶¶ 53-55.

Three provisions of the Creative employment agreement are relevant here. First, the agreement stated that the costs of Lyu's visa application would be deducted from her salary. *Id.* ¶ 150. Second, it said that if Lyu worked for Creative for fewer than two years, she would have to pay up to $24,000 in liquidated damages. *Id.* ¶ 149. Third, it said that if Creative successfully sponsored Lyu for an H1-B visa, but she worked at Creative for fewer than four years, then she would have to pay up to $48,000 in liquidated damages. *Id.* ¶ 151.

**B.   Lyu Transfers to Alfa Chemistry**

Lyu worked at Creative for around two months. *Id.* ¶ 64. Creative then informed her that it would no longer sponsor her visa. *Id.* So, in February 2023, Lyu transferred to Alfa Chemistry, where she worked as a project manager. *Id.* ¶¶ 64-65. Alfa Chemistry is a chemical supply company. *Id.* ¶ 16. Like Creative, Alfa Chemistry was founded by Chen and owned by CD Biosciences. *Id.* ¶¶ 16, 30, 39. When Lyu accepted Alfa's offer, she signed an employment agreement that was

3

"virtually identical" to the one she signed with Creative. *Id.*
¶¶ 66, 82.  Lin remained her supervisor, and he also signed her
employment agreement with Alfa.  *Id.* ¶¶ 53-55.

Shortly after Lyu joined Alfa, the company informed
her that she was entitled to no paid time off during her first
year of employment.  *Id.* ¶ 105.  Lyu received this notice
through a Chinese-language WeChat group, which only included
Alfa's Chinese employees.  *Id.* ¶¶ 103, 105-06.  This notice
conflicted with Lyu's offer letter, which stated that she would
receive five paid personal days during her first year.  *Id.*
¶ 104.

Around the same time, Alfa required Lyu — like all
other Chinese employees — to sign a "highly restrictive
confidentiality agreement," which purported to be "effective
forever" and "globally enforceable" in the courts of any
country.  *Id.* ¶¶ 109-10.  The company also required Lyu — like
all other Chinese employees — to provide the names, occupations,
and addresses of her family members, including her parents.  *Id.*
¶ 107.  Non-Chinese employees were not required to sign the
confidentiality agreement or to provide information about their
families.  *Id.* ¶¶ 108-110.

Shortly after beginning her employment, Lyu alleges,
she learned about several fraudulent business practices.  She
observed that Alfa would advertise products as being made in the

4

United States, but then import them from China and falsely label them as produced in the United States. *Id.* ¶ 88. Lyu also alleges that although Alfa claimed to perform biological testing in the United States, it shipped samples to China for analysis. *Id.* ¶ 92. According to Lyu, Alfa required her and other Chinese employees — but not non-Chinese employees — to scrape labels off human biological samples and "relabel them as something else . . . that was not subject to the same strict U.S. government shipping and labeling restrictions." *Id.* ¶¶ 93, 111.

Lyu further claims that during her tenure at Alfa, male coworkers and supervisors insulted and bullied their female colleagues. *Id.* ¶ 112. For example, male employees in the Chinese-language WeChat referred to a female coworker as a "f***ing princess" and an "annoying f***ing idiot." *Id.* ¶ 125. Lyu also alleges verbal abuse by her coworkers. A male coworker screamed at her and threw a credit card in her face. *Id.* ¶ 119. Others told her that her "work [was] meaningless," that she should "stay home and look after her husband and children," and that she was "only there to assist [a male coworker's] work." *Id.* ¶¶ 120-21.

C.    **Lyu Complains And Is Terminated**

Lyu alleges that she repeatedly (and unsuccessfully) complained about working conditions, Alfa's business practices, and harassment of female employees. For example, she reported

verbal abuse by male colleagues to Lin (who told her to "shut up" and apologize to her male coworkers). *Id.* ¶ 123. She complained to Lin about Alfa's "business of illegally smuggling rare earth minerals from China," and its "practice of selling medicine without requisite certification or quality control." *Id.* ¶¶ 97-100, 165. And she complained to certain unspecified defendants about working weekends without pay, and about her coworkers' refusal to wear personal protective equipment while doing experimental research. *Id.* ¶¶ 164, 166.

These complaints came to a head in May 2023, when Alfa dismissed Lyu. *Id.* ¶ 168. Lin told Lyu that she was "being fired because of her complaints." *Id.* ¶¶ 169-70. And Chen told her that she was "too much of a scientist but not committed to the 'business' of the company." *Id.* ¶ 172. Lyu brought this lawsuit five months later.

## II.  Legal Standard

To survive a motion to dismiss, a complaint must include "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The pleading cannot merely rely on conclusory assertions or "formulaic recitations of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Rather, it must allege facts that "raise a right to relief above the speculative level." *Id.*

6

## III. Discussion

Lyu has brought federal and state claims.  Her federal claims are for racial discrimination and retaliation under 42 U.S.C. § 1981, and for forced labor under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1589.  Her state claims are for race discrimination, sex discrimination, and retaliation under the New York State Human Rights Law ("NYSHRL"), as well as various wage and overtime violations under the New York Labor Law ("NYLL").

### A.    The Claims Against CD Biosciences

At the outset, the parent-company defendant (CD Biosciences) argues that Lyu's complaint should be dismissed in full as against it.  The crux of this argument is that Lyu adduced no facts supporting CD Biosciences' involvement in any of the challenged conduct.  Def. Mem. in Supp. of Mot. to Dismiss 16-18, ECF No. 25.  Instead, Lyu challenges actions taken by Alfa and Creative — which are subsidiaries of CD BioSciences, *see* Compl. ¶ 30 — and their employees.  Lyu responds that she may sue CD Biosciences under the single-employer doctrine.[2]  Lyu is correct.

---

[2] There are two doctrines that "enable an employee . . . to assert employer liability against an entity that is not formally his or her employer."  *Arculeo v. On-Site Sales & Marketing, LLC*, 425 F.3d 193, 197 (2d Cir. 2005).  These are the joint-employer and single-employer doctrines.  *Id.*  While superficially similar, the doctrines are analytically distinct.  *Id.*  The relevant heading of Lyu's brief describes her claims against CD Biosciences as "joint employment claims."  Pl.'s Mem. in Opp'n to Mot. to

Under the single-employer doctrine, a court may find
that "two [or more] nominally separate entities are actually
part of a single integrated enterprise." *Arculeo v. On-Site
Sales & Marketing, LLC*, 425 F.3d 193, 198 (2d Cir. 2005).  In
such circumstances, "an employee, who is technically employed on
the books of one entity . . . may impose liability for certain
violations of employment law not only on the nominal employer
but also on another entity comprising part of the single
integrated employer." *Id.*  The single-employer doctrine can
apply where, as here, the defendants are "parent and
wholly-owned subsidiary corporations." *Id.*

We apply a four-factor test to determine if a parent
and a subsidiary plausibly constitute a single employer. *Turley
v. ISG Lackawanna, Inc.*, 774 F.3d 140, 155-56 (2d Cir. 2014).
That test applies identically to claims under Section 1981 and
the NYSHRL.  *Id.* at 155-56 & n.13; *see also Juhua Han v. Kuni's
Corp.*, No. 19-CV-6265, 2020 WL 2614726, at *8 (S.D.N.Y. May 22,
2020).  Under the test, a court must consider the entities' "(1)
interrelation of operations, (2) centralized control of labor
relations, (3) common management, and (4) common ownership or
financial control." *Turley*, 774 F.3d at 156.  No single factor

_____

Dismiss 18, ECF No. 26.  But the brief then cites case law from both the
joint- and single-employer contexts.  *Id.* at 18-19.  The Court therefore
construes Lyu as arguing for the application of both doctrines.  Because the
single-employer doctrine is the better fit, the Court only analyzes that
doctrine here.

is dispositive, though the second factor is the "most significant." *Id.* This test poses a lower threshold for a plaintiff than would be required to pierce the corporate veil under state law. *Id.* (noting that the single-employer inquiry, unlike traditional veil-piercing, does not require evidence of "unlawful motive," "intent to use the corporate form to avoid contractual obligations," or "the parent company's exercise[] [of] day-to-day control over labor relations").

All four factors weigh in Lyu's favor here.

First, the complaint plausibly alleges interrelation of operations. The three firms shared a financial department, which processed salary payments for all employees. Compl. ¶ 78. They also shared employees. *Id.* ¶ 83. For example, Chinese employees from each firm — including the parent company — attended a joint meeting every month. *Id.* ¶ 77. Furthermore, Lyu received packages and made telephone calls on behalf of all three entities while employed at Alfa and Creative. *Id.* ¶ 84.

Second, the complaint plausibly alleges centralized control of labor relations. Lyu alleges that Lin handled recruitment for all three firms. *Id.* ¶ 80. She alleges that Chen — the chief executive of CD Biosciences — determined her pay and employment conditions. *Id.* ¶ 48. And she claims that the employment agreements she signed at Alfa and Creative were

9

virtually identical, except for the logo at the top of the page. *Id.* ¶¶ 66, 82.

Third, Lyu plausibly alleges that the firms shared common management.  Chen could hire and fire employees at all three firms.  *Id.* ¶ 42.  He also "set the policies and procedures" for each firm, and had the "power to make binding decisions" for all three firms.  *Id.* ¶¶ 41, 44.

Fourth, the firms were commonly owned.  Chen founded and owned all three of them.[3]  *Id.* ¶¶ 30, 39, 73.  Thus, the Court concludes that Lyu has sufficiently alleged that Alfa, Creative, and CD Biosciences all constituted a single employer for purposes of her Section 1981 and NYSHRL claims.

The single-employer doctrine also applies to Lyu's TVPRA claims.  Where a statute gives rise to a tort-like cause of action, but is silent on the issue of vicarious liability, courts assume that Congress intended to incorporate "ordinary tort-related vicarious liability rules."  *Meyer v. Holley*, 537 U.S. 280, 285 (2003).  The TVPRA creates a cause of action for forced labor, but it says nothing about vicarious liability. So, the scope of vicarious liability under that statute is construed according to "federal common-law principles of

_____

[3]  The complaint alleges that Chen is the sole owner of all three companies, Compl. ¶ 39, but also that CD Biosciences is the "parent company" of Alfa and Creative.  *Id.* ¶ 30.  The Court reads these allegations to imply that Chen owns CD Biosciences, and thus owns Alfa and Creative indirectly, by virtue of his stake in their corporate parent.

agency." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 168 (2016) (finding "no cause to question" agency's and lower court's conclusion that federal common-law principles governed vicarious liability under the Telephone Consumer Protection Act); *see also Meyer*, 537 U.S. at 285.

The single-employer doctrine is a federal common-law theory of vicarious liability. *See Felder v. United States Tennis Assoc.*, 27 F.4th 834, 843 (2d Cir. 2022) (definition of "employer" under Title VII governed by "the federal common law of agency"); *Local 397, Intern. Union of Elec., Elec. Salaried Mach. & Furniture Workers, AFL-CIO v. Midwest Fasteners, Inc.*, 779 F. Supp. 788, 792 (D.N.J. 1992) (describing "the federal common law's single employer doctrine"). Thus, in the absence of any contrary legislative directive, the single-employer doctrine applies to forced-labor claims under the TVPRA. *See Meyer*, 537 U.S. at 285.

**B.    The Section 1981 Claims (Counts 1 and 7)**

1.    <u>Race Discrimination (Count 1)</u>

To plead a prima facie case of employment discrimination under Section 1981, a plaintiff must allege that (1) she was part of a protected racial group; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances surrounding that adverse employment action suggest an "inference of

11

discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 311-12 (2d Cir. 2015); *see also Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 223 (E.D.N.Y. 2018) (Section 1981 "only pertains to racial discrimination"). Discriminatory motivation must be a plausible but-for cause of the adverse employment action. *Comcast Corp. v. Nat'l Ass'n of Af. Am.-Owned Media*, 589 U.S. 327, 329-330 (2020).

The first two elements of this test are not disputed. Lyu is a member of a protected class: persons of the "Chinese race." Compl. ¶¶ 11, 180; *see Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) ("It is clear . . . that [Section 1981] provided protection for immigrant groups such as the Chinese."); *Anderson v. Conboy*, 156 F.3d 167, 174 (2d Cir. 1998) ("The desire to protect Chinese immigrants from discrimination . . . is as consistent with prohibiting racial discrimination as with prohibiting alienage discrimination."). And given that Lyu holds a doctorate in medical chemistry, that the defendants hired her, and that they eventually informed her she was "too much of a scientist," she is plausibly qualified for a research scientist or project manager job at a medical supply and testing company. Compl. ¶¶ 1, 12, 172. The Court therefore follows the parties' lead and focuses on the third and fourth elements of this standard.

       a.   Lyu Plausibly Alleges an Adverse Employment
           Action

      Lyu has plausibly alleged several adverse employment actions.  An adverse employment action is a "materially adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008).  This can include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  *Id.*

      Two allegations in the complaint satisfy this standard.[4]  First, Lyu was terminated, which is a "quintessential" adverse employment action.  *Sealy v. State Univ. of N.Y. At Stony Brook*, 408 F. Supp. 3d 218, 226 (E.D.N.Y. 2019).  Second, Alfa denied Lyu five days' paid leave, notwithstanding the promise in her offer letter.  Compl. ¶ 105.  This is a "material loss of benefits" to which she was otherwise entitled, which also constitutes adverse employment action.  *Mathirampuzha*, 548 F.3d at 78; *see also Herbowy-Hubalek v.*

---

    [4] Two other allegations do not.  According to Lyu, the requirements that she sign a confidentiality agreement and disclose information about her relatives also qualify as adverse employment actions.  However, she has not explained how either requirement materially altered the terms and conditions of her employment.  Nor has she identified case law finding that similar requirements qualified as adverse employment actions.  As such, the Court declines, at this stage, to hold that these allegations describe an adverse employment action.

*Lithia of Yorkville-3, LLC*, No. 21-CV-43, 2021 WL 6050177, at *7 (N.D.N.Y. Dec. 20, 2021) (employer's "refusal to let Plaintiff use paid time off she had earned" was an adverse employment action).

The defendants respond that the denial of paid time off cannot qualify *here* as an adverse employment action.  Def. Mem. in Supp. of Mot. to Dismiss 6.  The crux of this argument is that an adverse employment action requires a *change* in the terms of employment.  Put differently, a term that was part of the original employment agreement cannot qualify as adverse employment action.  But this argument fails for two reasons. First, Lyu does, in fact, allege a material change to her original employment agreement.  Her Alfa offer letter guaranteed five days of time off, and the company withdrew this benefit only after she started work.  Compl. ¶¶ 104-05.  Second, and perhaps more importantly, the defendants' argument misstates the law.  Section 1981 bars forming employment agreements on racially disparate terms.  *Gonzalez v. Home Ins. Co.*, 909 F.2d 716, 720-21 (2d Cir. 1990) ("[Section] 1981 prohibits not only racially motivated refusals to enter into contracts but also offers to enter into a contract only on discriminatory terms."). So, even if Lyu's original contract had denied her any paid time off, the fact that non-Chinese employees were provided such time off would still be actionable under Section 1981.  *Id.*

14

b.   Lyu Plausibly Alleges an Inference of Racially Discriminatory Intent

Finally, Lyu has pleaded a plausible inference of discriminatory intent — but only as to the revocation of paid time off.  "An inference of discrimination can arise from . . . more favorable treatment of employees not in the protected group[,] or the sequence of events leading to the [action]." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).  To show an inference of discrimination based on disparate treatment, the plaintiff must show that she was treated "less favorably than a similarly situated employee outside [her] protected group."  *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010).

Lyu has plausibly alleged that the revocation of her paid time off was racially motivated.  She begins by alleging that Chinese employees lost their time off, while non-Chinese employees did not.  Compl. ¶¶ 104-05.  Because she does not allege that she was similarly situated to the non-Chinese employees that kept their time off, this allegation is not sufficient on its own.  *Ruiz*, 609 F.3d at 493; *see also Zheng-Smith v. Nassau Health Care Corp.*, 486 F. Supp. 3d 611, 622 (E.D.N.Y. 2020) (Section 1981 claim "fail[ed] to get out of the gate" where plaintiff attempted to raise inference of discrimination based on disparate treatment, but alleged "no

similarly situated comparator"). But Lyu also alleges that Alfa only announced the policy via a Chinese-language-only WeChat group. Compl. ¶¶ 105-06. This makes it plausible that the policy distinguished between employees based on their race, rather than a race-neutral factor like their expertise or seniority within the company.

Lyu is less successful with respect to her termination. She does not plausibly allege that she was fired because of her race. On the contrary, the complaint itself alleges that Lin and Chen fired Lyu for complaining about workplace conditions, such as excessive hours and her coworkers' refusal to wear protective equipment, and misogynistic comments by her male coworkers. Compl. ¶¶ 169-72 It provides no facts from which the Court can discern a racial motivation for Lyu's dismissal.

In sum, Lyu's race-discrimination claim may proceed under Section 1981, but only as to the revocation of her paid time off.

2. <u>Retaliation (Count 7)</u>

To plead a prima facie case of retaliation under Section 1981, Lyu must allege that (1) she engaged in protected activity; (2) her employer knew about it; (3) her employer took an adverse employment action; and (4) there was a causal link between her protected activity and the adverse action.

*Littlejohn*, 795 F.3d at 315-16.  "The term 'protected activity' refers to actions taken to protest or oppose statutorily prohibited discrimination."  *Villavicencio v. Gure-Perez*, 56 F. Supp. 3d 178, 187 (E.D.N.Y. 2014).  In the Section 1981 context, "statutorily prohibited discrimination" means racial discrimination.  *Amaya*, 295 F. Supp. 3d at 223 (Section 1981 does not reach discrimination based on sex).  Thus, the plaintiff must clarify that she is "complaining of unfair treatment due to h[er] membership in a protected [racial group] and that [s]he is not complaining merely of unfair treatment generally."  *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 308-09 (S.D.N.Y. 2009).

Lyu does not plausibly allege that she engaged in protected activity under Section 1981.  While Lyu complained about workplace conditions and sex discrimination, *see, e.g.*, Compl. ¶¶ 162-67, she does not allege that she complained about racial discrimination to any defendant.  In her brief, Lyu responds that the policies she complained about were nevertheless "discriminatorily applied to the Chinese employees."  Pl.'s Mem. in Opp'n to Mot. to Dismiss 7.  But not every complaint about a disparately applied policy is necessarily a complaint about racial discrimination.  *Armfield v. Jacobson*, No. 95-CV-4820, 1998 WL 427560, at *8 (E.D.N.Y. Jan. 21, 1998) (quoting *Barber v. CSX Distrib. Servs.*, 68 F.3d

17

694, 702 (3d Cir. 1995)) (a "general complaint of unfair treatment does not translate into a charge of illegal racial discrimination" for purposes of a retaliation claim).

Take, for example, Lyu's complaint about being "forced to work at the office over the weekend without any extra pay." Compl. ¶ 162. It is entirely possible that Lyu was complaining about Chinese employees working more hours than non-Chinese employees. But it is equally possible that she was complaining about her own personal workload. The complaint alleges no facts favoring one interpretation over the other. Thus, the complaint does not allege that Lyu clearly complained about racial discrimination rather than "unfair treatment generally." *Aspilaire*, 612 F. Supp. 2d at 308-09; *see also Coleman v. City of New York*, No. 17-CV-7864, 2018 WL 5723133, at *7 (S.D.N.Y. Nov. 1, 2018) ("Absent facts plausibly tying Nunez's conduct to a complaint about racial discrimination, Nunez's conduct is instead plausibly read as arising from a quotidian (non-race-related) complaint about work allocation and workplace fairness."). Lyu's retaliation claim must be dismissed.

## C.    The NYSHRL Claims (Counts 2, 3, and 8)

Lyu has brought state-law claims for race discrimination, sex discrimination, and retaliation under the NYSHRL. These claims can go forward.

1.   <u>Race Discrimination under the NSYRHL (Count 2)</u>

Claims for racial employment discrimination under the NYSHRL "are treated the same as employment discrimination claims under . . . Section 1981." *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 586 (S.D.N.Y. 2011).  So, the state-law race discrimination claim survives for the reasons (and to the extent) outlined in Section III.B.1.

2.   <u>Sex Discrimination under the NSYRHL (Count 3)</u>

Lyu advances two theories of sex discrimination under the NYSHRL: disparate treatment and hostile work environment. Compl. ¶ 112.  The claim may proceed under the first theory.

      a.   Lyu Plausibly Alleges a Disparate Treatment Theory of Sex Discrimination

The elements of a disparate treatment claim under the NYSHRL are like those for Section 1981.  A plaintiff must allege "(1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) circumstances surrounding the employment action that give rise to an inference of discrimination [based on sex]." *Fahrenkug v. Verizon Serv. Corp.*, 652 F. App'x 54, 56 (2d Cir. 2016).  The causation standard, however, is different: a NYSHRL plaintiff need only show that her sex was a "motivating factor" behind the adverse employment action.  *Farmer v. Shake Shack Ents.*, 473 F.

Supp. 3d 309, 324 (S.D.N.Y. 2000) (quoting *Vega v. Hempstead Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015)).

Once again, the parties do not dispute that Lyu was a member of a protected class and that her job performance was satisfactory. As for adverse employment action, Lyu appears to identify two types. *See* Compl. ¶ 191. The first is her firing, and as already noted, dismissal is a paradigmatic adverse action. *Sealy*, 408 F. Supp. 3d at 226.

The second is the "bullying and harassment" she faced from Lin and her male coworkers. *See* Compl. ¶ 191. There are a few ways to interpret this assertion. Lyu may be arguing that Lin engaged in an adverse employment action when he shouted at her for reporting harassment by her colleagues. This argument fails, because courts in this circuit have consistently held that yelling, rudeness, and unjustified criticism are not themselves adverse employment actions. *See Missick v. City of New York*, 707 F. Supp. 2d 336, 348 n.5 (E.D.N.Y. 2010) (collecting cases).

Relatedly, Lyu may be suggesting that Lin's screaming, together with his failure to stem the stream of abuse directed at her by others, constituted an adverse employment action. But this argument fits better under the rubric of a hostile work environment claim. *See, e.g., Legg v. Ulster Cnty.*, 979 F.3d 101, 115 (2d Cir. 2020) (supervisor may be liable for employee's

conduct under hostile work environment theory where supervisor had actual or constructive knowledge of employee's harassing behavior but "failed to take appropriate remedial action").  So, for purposes of the disparate treatment claim, the only relevant adverse employment action is Lyu's firing.

As for causation, Lyu has plausibly alleged that her sex was a motivating factor in the defendants' decision to fire her.  Specifically, she has alleged that the defendants fired her because she did not conform to stereotypes about female docility.  *See* Compl. ¶¶ 113-14, 169, 172; *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 200 (2d Cir. 2017) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-52, 258, 272-73 (1989)) ("An adverse employment action "rooted in sex stereotyping . . . [is] actionable as sex discrimination."). Chen is alleged to have "admitted on multiple occasions Defendants' preference for hiring women because they do not complain."  Compl. ¶ 113.  One of Chen or Lin said that the companies recruited women because they were "less wild than males and better at serving clients and supervisors," *id.* ¶ 114 — further support for the allegation that sex stereotypes prevailed at the subject companies, and that Lyu's termination occurred (at least in part) because she defied those stereotypes.  Ultimately, both Chen and Lin cited Lyu's repeated workplace complaints as the basis for her dismissal.  *Id.*

¶¶ 169, 172.  Thus, Lyu has plausibly alleged that they fired her because she did not conform to their belief that female employees should keep workplace complaints to themselves.

> b.    Lyu Does Not Plausibly Allege a Hostile Work Environment

A plaintiff pleads a hostile work environment under the NYSHRL by alleging "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Summa v. Hofstra Univ.*, 708 F.3d 115, 123-24 (2d Cir. 2013).  The plaintiff must allege misconduct "severe or pervasive enough to create an objectively hostile or abusive work environment," *and* that she subjectively perceived the environment to be abusive.  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).

Here, Lyu relies primarily on misogynistic statements by coworkers, including those directed against her and those directed against her female colleague in the Chinese-language WeChat group.  Pl.'s Mem. in Opp'n to Mot. to Dismiss 14.  But allegations of sporadic comments by coworkers are insufficient to state a claim for a hostile work environment.  *See Alfano*, 294 F.3d at 374, 379-81; *Beale v. Mt. Vernon Police Dep't*, 895 F. Supp. 2d 576, 588-91 (S.D.N.Y. 2012) (collecting similar

cases); *cf. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (Title VII is not a "general civility code," and therefore does not proscribe "the sporadic use of abusive language [or] gender-related jokes").

For example, in *Beale*, the plaintiff's male colleagues in a police department called other female employees "bitches" and "bobbleheads," referred to women as "useless and not belonging on the job," and implied that the plaintiff should work as a prostitute.  895 F. Supp. 2d at 589.  The court noted that while these comments were "sophomoric" and reflected a "[seventeenth] century view of women," they did not plausibly amount to severe or pervasive workplace harassment.  *Id.* at 588-90.  The same logic applies here.  The statements outlined in the complaint may reflect ignorance and rudeness, but they are no more pervasive or severe than the ones discussed in *Beale*.  Accordingly, the Court concludes that Lyu has not sufficiently stated a claim for a hostile work environment under the NYSHRL.

3.   Retaliation under the NSYRHL (Count 8)

Lyu has also brought a state-law retaliation claim under the NYSHRL (Count 8).  To the extent this claim is based on alleged complaints about racial discrimination, it cannot survive for the same reasons outlined above.  *Bermudez*, 783 F. Supp. 2d at 576 ("[R]etaliation claims under the NYSHRL are

treated the same as retaliation claims under . . . Section 1981."). However, unlike Section 1981, the NYSHRL also prohibits discrimination based on sex. N.Y. Exec. Law § 269(1)(a). And Lyu has plausibly alleged a retaliation claim based on her complaints about sexual harassment in the workplace.

Again, to state such a claim, Lyu must allege (1) that she engaged in protected activity; (2) that the defendants knew about that activity; (3) that she suffered an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). Although neither the New York Court of Appeals nor the Second Circuit have definitively resolved the issue, courts in this circuit consistently hold that the NYSHRL (like Title VII) requires a retaliation plaintiff to plead but-for causation. *Farmer*, 473 F. Supp. 3d at 333 n.7 (collecting in-circuit authority); *see also Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 7 (2d Cir. 2017) (affirming that the record did not support causation under the NYSHRL's "but-for causation standard").

Lyu satisfies this standard. First, she plausibly alleges that she participated in protected activity, namely,

complaining to Lin about harassment from male coworkers.[5]  *See*
*Alvarado v. Mt. Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d
763, 782-83 (S.D.N.Y. 2019) (plaintiff plausibly engaged in
protected activity when she complained to school management
about harassment by male coworker).  Second, she alleges that
both Lin and Chen were aware of her complaints.  Compl.
¶¶ 122-23, 171-72.  Third, she was fired, and therefore suffered
an adverse employment action.  *Id.* ¶ 168; *Sealy*, 408 F. Supp. 3d
218 at 226.  Fourth, Lyu has alleged a plausible causal
connection between her complaints and her firing.  She pleads
that both Lin and Chen expressly referenced her complaints to
management as the basis for her firing.  Compl. ¶¶ 169-72.
Moreover, the defendants fired Lyu less than two months after
she complained to Lin about sex-based harassment in the
workplace.  *Id.* ¶¶ 120-23, 168.  "[A] plaintiff can indirectly
support a . . . retaliation claim by showing that the protected
activity was closely followed in time by the adverse employment
action."  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110
(2d Cir. 2010).  And courts regularly find that a gap of less
than two months is short enough to support a plausible inference

---

[5] Although the Court has concluded that this harassment is insufficient
to constitute a hostile work environment, this holding does not preclude
Lyu's retaliation claim.  A retaliation plaintiff need only have "a good
faith, reasonable belief" that the conduct she is challenging an unlawful
employment practice.  *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d
Cir. 2001).  The defendants have never argued, nor does the record suggest,
that Lyu's complaints were unreasonable or brought in bad faith.

of causation.  *See Vega*, 801 F.3d at 92 (two-month gap between filing of complaint and first poor evaluation from supervisor sufficient to plead inference of causation); *Crosby v. Stew Leonard's Yonkers LLC*, 695 F. Supp. 3d 551, 572 (S.D.N.Y. 2023) (collecting cases).

Thus, the Court concludes that Lyu has pled a plausible claim for retaliation under the NYSHRL.

4.    Defendant Lin's Liability for the State-Law Discrimination Claims

The defendants argue that even if Lyu's NYSHRL claims proceed, they should not proceed against Lin.  They point out that under New York law, a corporate employee (even if he is a manager or supervisor) is not an "employer" and is therefore not liable under the NYSHRL.  *Doe v. Bloomberg, L.P.*, 167 N.E.3d 454, 458-59 (N.Y. 2021); *see also Patrowich v. Chemical Bank*, 473 N.E.2d 11, 12 (N.Y. 1984).  Thus, they argue, even if Lin had the power to supervise Lyu's work, he was not her employer and therefore was not liable under the NYSHRL.

The defendants are half-right.  Lin is not liable as an "employer" under the NYSHRL, and he does not become subject to liability simply because he supervised individuals who now complain of employment discrimination.  *Doe*, 167 N.E.3d at 458-59.  But he can still be liable for aiding or abetting an employer's discriminatory practices.  N.Y. Exec. Law § 296(6);

*see also Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) *and Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

And the complaint plausibly alleges that Lin did just that. When Lin informed Lyu that she was fired, he specifically referenced her workplace complaints, including her complaints about sexual harassment. *Id.* ¶¶ 169-70. Lin was plausibly aware of some of those complaint, because he allegedly told Lyu to "shut up" and apologize to her alleged harassers. Compl. ¶ 123. Thus, the complaint adequately suggests that Lin aided and abetted in the discriminatory practices of Lyu's employer, because he "actually participate[d] in the conduct giving rise to a discrimination claim," i.e., firing her because of her complaints. *Tomka*, 66 F.3d at 1317; *see also Bonaffini v. City Univ. of New York*, No. 20-CV-5118, 2021 WL 2895688, at *3 (E.D.N.Y. July 9, 2021) (complaint plausibly alleged aiding-and-abetting liability against administrator who cancelled academic courses on behalf of university).

**D.   The NYLL Claims (Counts 4, 5, 6, 9, and 10)**

Lyu also brings claims for unpaid overtime, failure to provide wage notices, failure to provide accurate wage statements, wrongful termination, and whistleblower retaliation under the NYLL. Compl. ¶¶ 199, 202, 205, 216, 225. The

defendants do not move to dismiss these claims wholesale. Rather, they argue that the claims should be dismissed as against Lin, because he was a corporate employee with limited supervisory authority over Lyu.  The Court concludes that it lacks supplemental jurisdiction over the NYLL claims, and therefore dismisses them without prejudice.

A court must confirm its subject-matter jurisdiction before addressing the merits.  *Singh v. United States Citizenship & Immigr. Servs.*, 878 F.3d 441, 445 (2d Cir. 2017). When a plaintiff brings both federal and state-law claims, a court may exercise supplemental jurisdiction over state-law claims that share a "common nucleus of operative fact" with the federal claims.  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).  Here, neither of Lyu's surviving federal claims justify supplemental jurisdiction over her NYLL claims.

The first potential federal anchor claim is the race-discrimination claim under Section 1981.  It is "well-established that [state] wage-and-hour claims . . . are, in general, factually distinct from [federal] discrimination claims."  *Dervisevic v. Wolfgang's Steakhouse, Inc.*, No. 19-CV-814, 2019 WL 6251197, at *2 (S.D.N.Y. Nov. 22, 2019) (citing similar cases).  That principle applies here.  To prove her NYLL claims, Lyu must show that she did not receive appropriate

28

compensation or wage statements.[6]  To prove her federal discrimination claim, she must show that her employer took adverse action based on racial animus.  There is a clear gap between these two factual showings.  *Id.*  And the fact that both claims stem from Lyu's employment relationship with the defendants is not enough to bridge that gap.  *Id.; see also Lyon v. Whisman*, 45 F.3d 758, 762-64 (3d Cir. 1995) (collecting cases and analyzing this issue in depth).

The closest Lyu comes to linking the two claims is her allegation that the defendants' failure to provide wage statements "facilitated [their] policy and practice of not providing her and other Chinese workers with overtime pay."  Compl. ¶ 143.  However, Lyu neither alleges facts supporting the existence of a racially disparate compensation scheme, nor clarifies how withholding wage statements from Chinese employees made this scheme easier to implement.  Thus, this passing (and conclusory) assertion in her complaint is not enough to show that the "facts underlying the federal and state claims substantially overla[p]."  *Lyndonville Sav. Bank & Trust Co.*, 211 F.3d 697, 704 (2d Cir. 2000).

---

[6]  The only exception is Lyu's whistleblower claim, which will mainly revolve around whether she protested to her employer about unlawful company activities that threatened public safety.  *See* N.Y. Lab.L. § 740.  But this claim still does not require Lyu to show that her employers acted with discriminatory animus, and therefore does not substantially overlap with her federal discrimination claim.

Lyu's federal forced-labor claim is also insufficient to establish supplemental jurisdiction over the NYLL claims. As discussed in more depth below, Lyu's forced-labor claim will require her to prove that the defendants knowingly obtained her labor by threatening serious harm that would compel a reasonable person to continue working. 18 U.S.C. § 1589. Proving this claim will not require evidence about her overtime pay or wage notices. Accordingly, there is again no clear factual overlap between the federal forced-labor claim and the NYLL claims.

In response, Lyu relies primarily on *Shukla v. Sharma*, in which Judge Ross observed that a worker's employment conditions, including their hours worked, "may provide support for a jury's conclusion that a defendant's threats plausibly compelled the victim to serve." No. 07-CV-2972, 2012 WL 481796, at *2 (E.D.N.Y. Feb. 14, 2012); *see also* Pl.'s Mem. in Opp'n to Mot. to Dismiss 22. But this merely shows that a narrow sliver of evidence may be *relevant* to both claims. It does not undermine the basic point that each claim will require a substantially distinct evidentiary showing, and therefore does not suffice to establish supplemental jurisdiction. *See, e.g.*, *Doe #1 v. Am. Fed. of Gov. Employees*, 554 F. Supp. 3d 75, 113 (D.D.C. 2021) ("[S]ome background factual overlap between a state claim and a federal claim is not sufficient to establish a common nucleus of operative fact."); *Doe v. Montgomery Hosp.*,

1995 WL 622887, at *2 (E.D. Pa. Oct. 18, 1995) ("The fact that two narrow pieces of evidence may be relevant to [both] claims is not sufficient to justify supplemental jurisdiction.").

Because the Court concludes that it lacks supplemental jurisdiction over the NYLL claims, it need not determine whether the claims should only be dismissed as against Lin.

**E.    The TVPRA Claim (Count 11)**

Under the Trafficking Victims Protection Reauthorization Act, it is illegal to "knowingly provide[] or obtain[] the labor or services of a person by means of serious harm or threats of serious harm to that person or another person."  18 U.S.C. § 1589(a)(2).  The phrase "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a reasonable person of the same background and in the same circumstances [as the plaintiff] to perform or continue performing labor or services in order to avoid incurring that harm."  *Id.* § 1589(c)(2).

To identify threats of serious harm, Lyu points to the two liquidated damages provisions included in her Alfa and Creative contracts.  Those provisions required her to pay up to $24,000 in damages if she left either company within two years, and up to $48,000 in damages if she received a work visa but left within four years.  Compl. ¶¶ 149, 151.  District courts

31

have held that liquidated damages provisions can constitute threats of serious harm under the TVPRA. *See, e.g.*, *Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850, 2021 WL 6197063, at *3 (E.D.N.Y. Dec. 20, 2021) (liquidated damages of $15 for every hour of a 6,000-hour requirement that the plaintiff failed to meet); *Paguirigan v. Prompt Nursing Employment Agency LLC*, 286 F. Supp. 3d 430, 438 (E.D.N.Y. 2017) ($25,000 liquidated damages provision).

Here, "it is not the amount of liquidated damages, *per se*, that controls the analysis." *Magtoles*, 2021 WL 6197063, at *4 (quoting *Dale Carmen v. Health Carousel, LLC*, 2021 WL 2476882, at *7 (S.D. Ohio June 17, 2021)). Rather, we must consider whether the liquidated damages clauses "rise to the level of serious harm considering all the surrounding circumstances," including the ratio between Lyu's earnings and the contemplated damages amounts, and whether the clauses can only be understood as punitive rather than compensatory. *Id.* Given the circumstances of this case, Lyu has sufficiently pleaded a serious-harm claim under the TVPRA.

First, the ratio between Lyu's annual salary and the amount of the damages provisions suggests that those provisions threatened serious harm. The complaint alleges that Lyu's annual salary at Creative and Alfa was $130,000. Compl. ¶¶ 60, 66. If Lyu received a visa but left Creative or Alfa within

four years, she would owe liquidated damages of $48,000 —
roughly one-third of her gross annual wage.  This potential
financial burden plausibly threatens serious harm under the
TVPRA.  *See Javier v. Beck*, No. 13-CV-2926, 2014 WL 3058456, at
*6 (S.D.N.Y. July 3, 2014) (threat to enforce "confession of
judgment . . . represent[ing] six months' gross wages" plausibly
satisfied serious-harm requirement); *Nunag-Tanedo v. E. Baton
Rouge Parish Sch. Bd.*, 790 F. Supp. 2d 1134, 1141, 1144 (C.D.
Cal. 2011) (threatened payment of "two months of [the
plaintiff's] expected salary" plausibly satisfied serious-harm
requirement); *cf. Paguirigan v. Prompt Nursing Employment Agency
LLC*, No. 17-CV-1302, 2019 WL 4647648, at *8, *18 (E.D.N.Y. Sept.
24, 2019) (collecting cases, and concluding on summary judgment
that liquidated damages provision equaling approximately nine
months of net wages met serious-harm requirement under TVPRA).

Second, Lyu has pleaded sufficient facts to justify a
conclusion that the provisions were unenforceable penalties
under New York contract law, which supports a finding of serious
harm.[7]  *Magtoles*, 2021 6197063, at *5.  In New York, if the
amount of a liquidated damages provision is "conspicuously

---

[7]  The enforceability of a liquidated damages provision is a
fact-intensive inquiry.  *See JMH Holding Corp. v. Congress Fin. Corp.*, 828
N.E.2d 604, 609 (N.Y. 2005).  Accordingly, it would be "inappropriate to make
a final determination on [enforceability] at the pleading stage." *Magtoles*,
2021 WL 6197063, at *4.  However, for purposes of the motion to dismiss, the
Court still makes a "preliminary assessment as to whether the complaint
pleads sufficient facts to support a finding" that the liquidated damages
provisions in this case are unenforceable penalties.  *Id.* at *5.

disproportionate to [the recipient's] foreseeable losses," then the provision is an unenforceable penalty. *Bates Advertising USA, Inc. v. 498 Seventh, LLC*, 850 N.E.2d 1137, 1139 (N.Y. 2006).  At least at this stage, the liquidated damages provisions in the Creative and Alfa contracts appear "conspicuously disproportionate" to any losses either company might incur from Lyu's departure.  Neither company paid any fees associated with Lyu's visa.  Compl. ¶¶ 66, 150.  And the complaint does not allege that the defendants incurred any costs (outside of salary and benefits, which would end once Lyu left) in reliance on Lyu's continued employment.  Thus, it is plausible that the clauses existed solely to punish Lyu for quitting.

The defendants respond that because they never threatened to enforce the liquidated damages provisions, the provisions did not threaten serious harm under the TVPRA.  Def. Mem. in Supp. of Mot. to Dismiss 10.  To be sure, in cases finding that liquidated damages provisions threaten serious harm, courts have regularly invoked the employer's threat to enforce those provisions.  *See Baldia v. RN Express Staffing Registry LLC*, 633 F. Supp. 3d 693, 705 (S.D.N.Y. 2022) (collecting cases).  But nothing in the case law *requires* such a

threat.  Indeed, *Magtoles* did not rely on an enforcement threat. 2021 WL 6197063, at *3-6.[8]

Moreover, there is no reason why an oral invocation of a liquidated damages provision would be necessary to state a claim at the pleading stage.  Parties to a contract are presumed to have read and understood its terms.  *E.g.*, *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004).  And it is plausible that mere knowledge of a liquidated damages provision — which Lyu alleges she had, *see* Compl. ¶ 152 — could dissuade a reasonable employee from departing.  This is especially true when the employee is a foreign citizen without "a deep (or any) understanding of the legal system."  *Dale Carmen*, 2021 WL 2476882, at *6.  In such circumstances, even if there is no explicit enforcement threat, "the *in terrorem* effect of such a provision may well provide a form of compulsion for that foreign citizen to remain in their job, no matter how distasteful that job has become to them."  *Id.*

---

[8]  The defendants argue that *Magtoles* did, in fact, involve an enforcement threat.  Def. Mem. in Supp. of Mot. to Dismiss 10.  At least one other court has interpreted *Magtoles* that way.  *Baldia*, 633 F. Supp. 3d at 705.  But the court in *Magtoles* merely stated that the employer's threat to enforce the liquidated damages provision "provide[d] *further factual support*" for the plaintiffs' TVPRA claim.  2021 WL 6197063, at *8 (emphasis added). At that point, it had "already found" that the existence of the liquidated damages provision threatened serious harm.  *Id.*  So, the enforcement threat simply reinforced a conclusion that the court had already reached.

In sum, the Court concludes that Lyu has stated a plausible serious-harm claim under Section 1589(a)(2) of the TVPRA.

## IV.  Conclusion

For the foregoing reasons, the defendants' motion to dismiss is granted in part and denied in part.  The Section 1981 retaliation claim is dismissed without prejudice, as are Lyu's state-law claims under the NYLL.  All other claims will proceed.


SO ORDERED.




_____/s/ Eric Komitee_____
ERIC KOMITEE
United States District Judge


Dated:    April 13, 2025
          Brooklyn, New York